WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Laurie Sue Tejeda,<br><br>              Plaintiff,<br><br>v.<br><br>Carolyn W. Colvin, Acting Commissioner of Social Security,<br><br>              Defendant. | No. CV-12-02353-PHX-BSB<br><br>**ORDER** |

       Laurie Sue Tejeda (Plaintiff) seeks judicial review of the final decision of the Commissioner of Social Security (the Commissioner), denying her application for disability insurance benefits under the Social Security Act (the Act). The parties have consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and have filed briefs in accordance with Local Rule of Civil Procedure 16.1. For the following reasons, the Court reverses the Commissioner's determination and remands for an award of benefits.

**I.    Procedural Background**

       On April 15, 2009, Plaintiff applied for disability insurance benefits and supplemental security income under Titles II and XVI of the Act. 42 U.S.C. §§ 401-34 (2012). (Tr. 30.)[1] Plaintiff alleged that she had been disabled since April 9, 2009. (*Id.*) After the Social Security Administration (SSA) denied Plaintiff's initial application and

---

    [1] Citations to "Tr." are to the certified administrative transcript of record. (Doc. 14.)

her request for reconsideration, she requested a hearing before an administrative law judge (ALJ). After conducting a hearing, the ALJ issued a decision finding Plaintiff not disabled under the Act. (Tr. 30-38.) This decision became the final decision of the Commissioner when the Social Security Administration Appeals Council denied Plaintiff's request for review. (Tr. 1); *see* 20 C.F.R. § 404.981 (2013) (explaining the effect of a disposition by the Appeals Council.) Plaintiff now seeks judicial review of this decision pursuant to 42 U.S.C. § 405(g).

**II.     Medical Record**

The record before the Court establishes the following history of diagnosis and treatment related to Plaintiff's physical health. The record also includes opinions from State Agency Physicians who either examined Plaintiff or reviewed the medical records, but who did not provide treatment. Although some of the history of Plaintiff's heart condition pre-dates the alleged onset date of her disability, the Court discusses these records as necessary to provide context for Plaintiff's current claims.

**A.     Medical Records before the April 9, 2009 Disability Onset Date**

During the summer of 2008, Plaintiff had regular episodes of syncope (fainting), including one episode that resulted in a car accident. (Tr. 282.) In July 2008, Wilber Su, M.D., a cardiologist, implanted a cardiac monitor to assess Plaintiff's episodes of syncope. (Tr. 284-85.) Later that month, he observed that the monitor showed several episodes of dangerously accelerated heart rates. (Tr. 271-72.) He admitted Plaintiff to the hospital, where doctor's noted an ejection fraction of forty percent.[2] (Tr. 271-72.) Dr. Su performed an ablation procedure and implanted a cardiac defibrillator. (Tr. 271-76.) At that time, he noted that Plaintiff had an increased risk of sudden cardiac death

---

[2] Defendant defines "ejection fraction" as "a measurement of the percentage of blood leaving a person's heart each time it contracts. An ejection fraction of fifty-five percent or higher is considered normal, an ejection fraction of forty to fifty-five percent is considered below normal, and an ejection fraction of less than forty percent may confirm a diagnosis of heart failure." (Doc. 21 at 3 n.3 (citing Understanding Your Ejection Fraction,  http://my.clevelandclinic.org/heart/disorders/heartfailure/ejectionfraction (last visited Aug. 23, 2013)). Plaintiff does not dispute this definition.

due to tachycardia. (Tr. 274.) Dr. Su cleared Plaintiff for discharge on July 25, 2008. (Tr. 271.) At that time, he diagnosed Plaintiff with atrial fibrillation and supraventricular tachycardia status post AV node ablation, congestive heart failure, fluid overload, dyspnea, and chronic pain syndrome. (Tr. 271-72.) Among other medications, Dr. Su prescribed an "ACE inhibitor" because Plaintiff's ejection fraction was forty percent. (Tr. 272.) An echocardiogram on August 10, 2008 revealed a left ventricle ejection fraction of forty-eight percent, severe left atrial enlargement, mild mitral regurgitation with mitral annular calcification, mild tricuspid regurgitation, and grade 1 LV diastolic dysfunction suggestive of impaired relaxation. (Tr. 318.)

### B. Medical Records after the April 9, 2009 Disability Onset Date

On April 10, 2009, Plaintiff was admitted to Banner Good Samaritan Medical Center complaining that her implanted defibrillator had shocked her the previous night. (Tr. 322.) Plaintiff reported to Claudia Dima, M.D., that before the shock she felt lightheaded and "she felt something was not right in her chest." (Tr. 322.) Dr. Dima described the defibrillator shock as "appropriate" because Plaintiff had ventricular fibrillation. Dr. Dima diagnosed Plaintiff with "[m]ultiple episodes of nonsustained ventricular tachycardia, probably [due to a] ventricular tachycardia storm," cardiomyopathy, abnormal TSH, and history of atrial fibrillation status post ablation. (Tr. 322-23, 329-31.) Dr. Dima noted Plaintiff's only medication at the time was Lasix. She planned to contact Dr. Su to see if Plaintiff could start taking a "beta blocker and ACE inhibitors for her cardiomyopathy." (Tr. 323.) On April 13, 2009, an echocardiogram showed that Plaintiff had a left ventricular ejection fraction of forty-five to fifty percent. (Tr. 325-26.) In mid-April 2009, an Agency employee interviewing Plaintiff in connection with her disability claim observed that Plaintiff appeared short of breath. (Tr. 212.)

During a May 2009 appointment, Plaintiff told Dr. Su that she had "felt well since hospital discharge" and denied any "other" complaints. (Tr. 403.) Information retrieved from Plaintiff's defibrillator showed "a very short burst of supraventricular arrhythmia,"

but "nothing sustained." (Tr. 403.) On examination, Plaintiff had a regular heart rate with no significant murmurs. (*Id.*) On May 11, 2009, Dr. Su signed a letter stating that Plaintiff was "permanently disabled" and could not work. (Tr. 337.) He opined that "[d]ue to her extensive cardiac condition," Plaintiff could not "tolerate even simple tasks that would cause exertion such as standing, sitting, lifting, walking, pushing or pulling." (*Id.*)

On June 2, 2009, Plaintiff had a follow-up visit with Dr. Su for her cardiomyopathy. (Tr. 402.) Plaintiff reported that her defibrillator had not discharged since April 2009. She "denie[d] any symptomology, palpitations, or chest pain." (*Id.*) Dr. Su noted that Plaintiff had chronic dyspnea with "no change from her baseline." (*Id.*) Dr. Su diagnosed Plaintiff with cardiomyopathy with an ejection fraction of forty to forty-five percent, congenital heart disease, mitral valve endocarditis status post mitral valve repair, hypertension, and a history of atrial fibrillation status post ablation. (*Id.*)

On August 13, 2009, William Chaffee, M.D., examined Plaintiff in connection with her application for disability benefits. (Tr. 347.) Dr. Chaffee diagnosed her with cardiomyopathy with recurrent supraventricular tachycardia, morbid obesity, and "suspected depression." (Tr. 350.) Plaintiff reported that she lived with her sister, performed light housework, and could walk half a block. (Tr. 347-48.) On examination, Dr. Chaffee found a regular heart rhythm, with no murmur or gallop. (Tr. 349.) He opined that Plaintiff could stand/walk two to six hours in an eight-hour day, and sit six to eight hours in an eight-hour day. (Tr. 350.) However, he explained that Plaintiff's "functional status [was] difficult to determine during the brief examination. More objective evidence such as a cardiac stress test or other studies to evaluate her cardiac function would be helpful." (Tr. 352.)

In September 2009, state agency physician Erika Wavak, M.D., reviewed the record and agreed with Dr. Chaffee's general opinion that Plaintiff had abilities consistent with a range of light work. However, she found that Plaintiff should only occasionally reach overhead with her left arm and should never climb ladders, ropes, or

scaffolds. (Tr. 374-81); *see* 20 C.F.R. § 404.1567(b) (defining light work). Dr. Wavak observed that Plaintiff apparently was not taking cardiac medication when her defibrillator discharged in April 2009, and that Plaintiff's most recent ejection fraction was forty-five to fifty percent. (Tr. 381.)

On November 10, 2009, Dr. Su completed a Medical Assessment of Ability to do Work-Related Physical Activities. (Tr. 382.) He opined that Plaintiff could sit less than two hours in an eight-hour work day, stand/walk less than two hours in an eight-hour work day, and could lift/carry less than ten pounds. (*Id.*) He further noted that Plaintiff's "fatigue, dizziness, CHF [congestive heart failure], and cardiomyopathy" limited her ability to sustain work activity for eight hours a day, five days a week. (Tr. 383.)

On November 16, 2009, Plaintiff saw Dr. Su at follow-up appointment for atrial fibrillation, cardiomyopathy, and defibrillator placement. (Tr. 400-01.) Dr. Su noted that Plaintiff had "been somewhat lost to follow up in the past six months." (Tr. 401.) He noted that Plaintiff "clinically has been feeling well and has no complaints." (Tr. 400.) He also noted that Plaintiff reported that "her heart failure symptoms [had] done much better," and that she "now has Class 2 heart failure symptoms." (*Id.*) Dr. Su noted that Plaintiff had permanent atrial fibrillation and required permanent Coumadin therapy. (Tr. 401.) An echocardiogram revealed an estimated left ventricular ejection fraction of fifty-six percent, along with enlarged left and right atrial sizes. (Tr. 404.)

In January 2010, state agency physician Terry Ostrowski, M.D., reviewed the record and opined that Plaintiff had abilities consistent with light work, with no manipulative limitations. (Tr. 386-93.) Dr. Ostrowski found that Plaintiff could stand/walk about six hours in an eight-hour day. (Tr. 387.) Dr. Ostrowski rejected examining physician Dr. Chaffee's stand/walk limit in view of Plaintiff's fifty percent ejection fraction. (Tr. 392.) In February 2010, Dr. Su signed a letter about Plaintiff's abilities that contained wording identical to the letter he signed in May 2009. (*Compare* Tr. 399 *with* Tr. 337.)

On April 5, 2010, Plaintiff saw Dr. Su for her continued heart problems. Dr. Su noted that Plaintiff "clinically" had been feeling well except for a few recent episodes of "near syncope." (Tr. 415.) An April 8, 2010 echocardiogram revealed a left ventricular ejection fraction of forty-five percent. (Tr. 450.) On July 30, 2010, Dr. Su noted that Plaintiff felt "good" and continued her medication for congestive heart failure. (Tr. 414.) On October 29, 2010, Dr. Su noted that Plaintiff had gained weight and had low energy. (Tr. 413.) Dr. Su made normal examination findings, observed that Plaintiff's defibrillator was within normal limits, and continued her medication. (Tr. 413.)

During this time, Plaintiff also received treatment at the Clinica Medica Del Sol. At an initial appointment in October 2010, Plaintiff reported coronary artery disease, headaches accompanied by blurry or double vision, and asthma. (Tr. 468-69.) In December 2010, Clinica Del Sol providers noted that a CT scan of Plaintiff's head was normal and they prescribed medication for her migraines and reported nausea. (Tr. 467.) They noted that Plaintiff was scheduled for cardiac ablation in April 2011. (Tr. 466.)

In November 2010, Plaintiff saw Dr. Su and reported a chronic cough. (Tr. 412-13.) Dr. Su referred Plaintiff to a pulmonologist. On December 17, 2010, Plaintiff saw pulmonologist Da-Wei Liao, M.D., for recurrent bronchitis and dyspnea with exertion. (Tr. 473.) Dr. Liao diagnosed extrinsic asthma, allergic rhinitis, and atrial fibrillation. (Tr. 473-75.) Dr. Liao noted that Plaintiff had no chest pain or discomfort and no palpitations. (Tr. 473.) He also noted that Plaintiff had dyspnea "especially with exertion," and a "nocturnal cough and worsening of dyspnea." (*Id.*)

In a January 18, 2011 letter, similar to letters he had signed in May 2009 and February 2010 (*Compare* Tr. 410 *with* Tr. 337, 399), Dr. Su stated that Plaintiff was unable to work due to her cardiac condition. (Tr. 410.) He opined that, "[d]ue to her extensive cardiac condition," Plaintiff could "not tolerate simple tasks that may [exacerbate her condition], such as standing, sitting, lifting, walking, and pushing or pulling." (*Id.*) Dr. Su explained that "numerous cardiac procedures" had not provided "a permanent cure" for Plaintiff's symptoms. He also noted that the placement of a

defibrillator "saved her life" in April 2009 during an episode of ventricular tachycardia. (*Id.*) He stated that Plaintiff was scheduled for a cryoablation procedure on April 4, 2011. (*Id.*)

On February 11, 2011, Dr. Su completed another Medical Assessment of Ability to do Work-Related Physical Activities. (Tr. 476.) He opined that, in an eight-hour day, Plaintiff could sit and stand/walk less than two hours. (*Id.*) He further found that she could lift or carry less than ten pounds. (*Id.*) He noted that Plaintiff's "fatigue, dizziness, cardiomyopathy, and CHF [congestive heart failure]" limited Plaintiff's ability to sustain work on a regular basis. (Tr. 477.)

### III. Administrative Hearing Testimony

Plaintiff was represented by counsel and testified at the administrative hearing. She was in her forties at the time of the hearing, she had a high school education, and her past relevant work included restaurant manager and server. (Tr. 39.) Plaintiff testified that, prior to her disability onset date, she missed work due to fatigue and heart problems. (Tr. 64.) Plaintiff testified that she had migraine headaches about four times a week. (Tr. 71-72, 74.) She also stated that, due to atrial fibrillation, she experienced shortness of breath, fatigue, lightheadedness, and swelling in her belly and lower extremities. (Tr. 67-69.) Plaintiff testified that, although these symptoms were worse with exertion, they could be triggered by sitting. (Tr. 67-68.) Plaintiff explained that lying down seemed to help her symptoms and that she took at least two naps per day that were one-to-three hours long. (Tr. 68.) Plaintiff further testified that "on average" she could sit or stand for thirty minutes at a time, and that she would be out of breath if she walked across the hearing room. (Tr. 75.) On an average day, she would dress and bathe herself, talk on the phone with friends, read, watch television, and go to the library, which was about a mile away. (Tr. 76-78.) She testified that she usually only drove within a one-mile radius of her home, but drove about ten miles to attend the hearing. (*Id.*) She also stated that she "rarely" shopped with her sister, and that she could make simple meals such as soup or salad. (Tr. 78.)

Vocational expert John Komar also testified at the hearing. He responded to a series of hypothetical questions, including whether an individual of Plaintiff's age, education, and work history could perform sedentary work that involved occasional stooping, crouching, kneeling, crawling, and climbing of ramps and stairs, if that person was limited to: (1) no climbing or ladders, ropes, or scaffolds, (2) no concentrated exposure to extreme temperatures or irritants such as fumes, odors, dust, and gases, and (3) no exposure to moving machinery or unprotected heights. (Tr. 81-82.) The vocational expert testified that the hypothetical individual could do the sedentary jobs of beverage order clerk, charge account clerk, and appointment clerk. (Tr. 82.)

The vocational expert also testified that an individual with the limitations Dr. Su assessed, who could sit less than two hours and stand/walk less than two hours (Tr. 476-77), would be unable to perform work. (Tr. 84-85.) The vocational expert further testified that an individual who napped twice during the day for one-to-three hours at a time would be unable to perform any work. (Tr. 85-86.)

**IV.   The ALJ's Decision**

A claimant is considered disabled under the Social Security Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard for supplemental security income disability insurance benefits). To determine whether a claimant is disabled, the ALJ uses a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920.

**A.   Five-Step Evaluation Process**

In the first two steps, a claimant seeking disability benefits must initially demonstrate (1) that she is not presently engaged in a substantial gainful activity, and (2) that her disability is severe. 20 C.F.R. § 404.1520(a)-(c). If a claimant meets steps one and two, there are two ways in which she may be found disabled at steps three

through five. At step three, she may prove that her impairment or combination of impairments meets or equals an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20 C.F.R. Part 404. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is presumptively disabled. If not, the ALJ determines the claimant's residual functional capacity (RFC). At step four, the ALJ determines whether a claimant's RFC precludes her from performing her past work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant establishes this prima facie case, the burden shifts to the government at step five to establish that the claimant can perform other jobs that exist in significant number in the national economy, considering the claimant's RFC, age, work experience, and education. If the government does not meet this burden, then the claimant is considered disabled within the meaning of the Act.

### B.  The ALJ's Application of Five-Step Evaluation Process

Applying the five-step sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period. (Tr. 32.) At step two, the ALJ found that Plaintiff had the following severe impairments: "non-ischemic cardiomyopathy; congestive heart failure; asthma; syncope; obesity; status post right ventricular defibrillator implantation; history of endocarditis; status mitral valve replacement; and supraventricular tachycardia and atrial fibrillation, status post AV node ablation and multiple ablations." (*Id.*)

At the third step, the ALJ found that the severity of Plaintiff's impairments did not meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 33.) The ALJ next concluded that Plaintiff retained the RFC to perform "sedentary work" with the following limitations: "[Plaintiff] is limited to occasional balancing, stooping, crouching, kneeling, and climbing or ramps and stairs, but must avoid climbing ladders, ropes, and scaffolds." (Tr. 34.) He further found that "[s]he must also avoid concentrated exposure to extreme heat and cold, fumes, odors, gases, and other irritants, as well as use of moving machinery and exposure to unprotected heights." (*Id.*)

At step four, the ALJ concluded that Plaintiff could not perform her past relevant work. (Tr. 36.) At step five, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, she could perform other "jobs that exist in significant numbers in the national economy." (Tr. 37.) The ALJ concluded that Plaintiff was not disabled within the meaning of the Act. (Tr. 38.)

## V. Standard of Review

The district court has the "power to enter, upon the pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The district court reviews the Commissioner's final decision under the substantial evidence standard and must affirm the Commissioner's decision if it is supported by substantial evidence and it is free from legal error. *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). Even if the ALJ erred, however, "[a] decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

Substantial evidence means more than a mere scintilla, but less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted); *see also Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005). In determining whether substantial evidence supports a decision, the court considers the record as a whole and "may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal quotation and citation omitted).

The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041).

**VI.   Plaintiff's Claims**

Plaintiff asserts that the ALJ erred in rejecting her symptom testimony without providing clear and convincing reasons for doing so, and in assigning weight to the medical source opinion evidence. (Doc. 20.) Plaintiff asks the Court to remand this matter for a determination of disability benefits. In response, the Commissioner argues that the ALJ's decision is free from legal error and is supported by substantial evidence in the record. (Doc. 21.)

**A.   The Two-Step Credibility Analysis**

An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).

The claimant is not required to show objective medical evidence of the pain itself or of a causal relationship between the impairment and the symptom. *Smolen*, 80 F.3d at 1282. Instead, the claimant must only show that an objectively verifiable impairment "could reasonably be expected" to produce his pain or other symptoms. *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1282); *see also Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d at 1160-61 (9th Cir. 2008) ("requiring that the medical impairment could reasonably be expected to produce pain or another symptom . . . requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon.").

Second, if a claimant produces medical evidence of an underlying impairment that is reasonably expected to produce some degree of the symptoms alleged, and there is no affirmative evidence of malingering, an ALJ must provide "clear and convincing reasons" for an adverse credibility determination. *See Smolen*, 80 F.3d at 1281; *Gregor v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006).

1 In evaluating a claimant's credibility, the ALJ may consider the claimant's daily activities, the location, duration, frequency, and intensity of the claimant's pain or other symptoms, precipitating and aggravating factors, medication taken, and treatments for relief of pain or other symptoms. *See* 20 C.F.R. § 404.1529(c); *Bunnell*, 947 F.2d at 346.[3] An ALJ may also consider such factors as a claimant's inconsistent statements concerning symptoms and other statements that appear less than candid, the claimant's reputation for lying, unexplained or inadequately explained failure to seek treatment or follow a prescribed course of treatment, medical evidence tending to discount the severity of the claimant's subjective claims, and vague testimony as to the alleged disability and symptoms. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008); *Smolen*, 80 F.3d 1273, 1284 (9th Cir. 1996). If substantial evidence supports the ALJ's credibility determination, that determination must be upheld, even if some of the reasons cited by the ALJ are not correct. *Carmickle*, 533 F.3d at 1162.

### B. Plaintiff's Subjective Complaints

Because there was no record evidence of malingering, the ALJ was required to provide clear and convincing reasons for concluding that Plaintiff's subjective complaints were not wholly credible. Plaintiff argues that the ALJ failed to do so. The ALJ listed two factors in support of his credibility assessment. First, he found that Plaintiff appeared to overstate her symptoms and to understate her activities. (Tr. 35.) Second, he found that her recent ejection fraction ranging from fifty to fifty-six percent was "not

---

[3] Relying on the Ninth Circuit decision in *Bunnell*, the Commissioner appears to argue that an ALJ need not provide "clear and convincing" reasons for discrediting a claimant's testimony regarding subjective symptoms, and instead must make findings that are "'supported by the record' and 'sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds.'" (Doc. 21 at 13 n.10 (citing *Bunnell*, 947 F.2d at 345-46).) In *Bunnell*, the court did not apply the "clear and convincing" standard, and the Commissioner argues that because no subsequent en banc court has overturned *Bunnell*, its standard remains the law of the Ninth Circuit. (Doc. 21 at 13 n.10.) Although the Ninth Circuit has not overturned *Bunnell*, subsequent cases have elaborated on its holding and have accepted the clear and convincing standard. *See Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1234 (9th Cir. 2011); *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009); *Lingenfelter*, 504 F.3d at 1036; *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). Accordingly, the Court will determine whether the ALJ provided clear and convincing reasons for discounting Plaintiff's credibility.

1 indicative of limitations precluding all work."[4]  (*Id.*)  Although the ALJ rejected Plaintiff's symptom testimony, he found that she "was very articulate at the hearing and otherwise appeared credible." (*Id.*)

### 1. Plaintiff's Activities/Inconsistent Reporting

In discounting Plaintiff's credibility, the ALJ noted that Plaintiff "overstate[d] her symptoms and understate[d] her activities of daily living." (Tr. 35.) He explained that she "reported to examining providers" that she could cook her own meals, shop by herself, and drive. (*Id.*) The Commissioner construes this statement as the ALJ's rejection of Plaintiff's subjective complaints based on inconsistencies in Plaintiff's symptom reporting. (Tr. 21 at 14.) The ALJ, however, did not make such a finding and this Court is "constrained to review the reasons the ALJ asserts."[5] *Connett*, 340 F.3d at 874. Although the ALJ's statements could be construed as rejecting Plaintiff's administrative hearing testimony based on inconsistencies between that testimony and reports she gave to "examining providers," the ALJ did not identify portions of Plaintiff's

---

[4] The Commissioner's response includes arguments and citations to the medical record in support of the ALJ's credibility determination that the ALJ did not make or discuss in his opinion. (Doc. 21 at 14.) For example, the Commissioner argues that Plaintiff's failure to take cardiac medication in April 2009 and evidence that her asthma was controlled with treatment undermines her credibility. (*Id.*) This Court's review is limited to "reasons and factual findings offered by the ALJ ─ not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking." *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1225–26 (9th Cir. 2009). Accordingly, the Court limits its analysis to the rationale upon which the ALJ relied in determining that Plaintiff was not disabled. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003) (stating that the court is "constrained to review the reasons the ALJ asserts.").

[5] Additionally, the conflicts in Petitioner's symptom reporting that the Commissioner identifies do not support the ALJ's credibility determination. (Doc. 21 at 15 (citing Tr. 343).) Plaintiff testified at the administrative hearing that she could dress herself, bathe herself, drive about a mile to the library, watch television, nap, and talk on the phone. (Tr. 76.) Plaintiff further testified that that she "rarely" shopped with her sister, and that her sister did most of the cooking. Plaintiff clarified that she could make simple meals. (Tr. 78-79.) This testimony is consistent with the report of examining psychologist Charles Jay House, Ph.D., who noted that Plaintiff reported making her own meals. (Tr. 343.) Although there may be a slight conflict between Plaintiff's 2011 hearing testimony that she "rarely" shopped with her sister (Tr. 78), and Dr. House's 2009 note that Plaintiff "can go shopping by herself" (Tr. 343), this minor inconsistency does not a provide clear and convincing reason for rejecting Plaintiff's testimony. *See Hatgy v. Comm'r of Soc. Sec. Admin.*, 2000 WL 140467, at * 4 (D. Or. Jan. 10, 2000) (minor variations in claimant's self-assessments and reported daily activities did not constitute a clear and convincing reason to disregard her testimony).

testimony as inconsistent with her prior symptom reports. (Tr. 35.) Thus, it appears that the ALJ found Plaintiff "less than fully credible" based on the activities of daily living she reported to the examining providers — cooking her own meals, shopping by herself, and driving. (*Id.*)

Although an ALJ may rely on activities that "contradict claims of a totally debilitating impairment" to find a claimant less than credible, *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012), the ALJ's finding here is not supported by substantial evidence. The record contains evidence that Plaintiff can shop, either with her sister or alone, make simple meals, and drive short distances. (Tr. 76-79, 343.) The Ninth Circuit has stated that the fact a claimant engages in normal daily activities "does not in any way detract from [her] credibility as to [her] overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). "One does not need to be 'utterly incapacitated' in order to be disabled." *Id*. (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). Rather, to defeat a claim of disability, a claimant's daily activities must involve skills that could be transferrable to a workplace and a claimant must spend a "substantial part of his day" engaged in those activities. *See Orn*, 495 F.3d at 639 (finding that the ALJ erred in failing to "meet the threshold for transferable work skills, the second ground for using daily activities in credibility determinations.")

Here, the ALJ did not find that Plaintiff's limited activities could be transferred to a work setting, or indicate whether Plaintiff spent a "substantial" part of her day engaged in such activities. The Ninth Circuit has opined that, "[d]aily household chores and grocery shopping are not activities that are easily transferable to a work environment." *Blau v. Astrue*, 263 Fed. Appx. 635, 637 (9th Cir. 2008). Thus, Plaintiff's limited activities of daily living did not provide clear and convincing evidence to discount her credibility. *See Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001) (limited activities did not constitute convincing evidence that the claimant could function regularly in a work setting).

### 2. Ejection Fraction

The ALJ also rejected Plaintiff's subjective complaints because he found that an ejection fraction of fifty to fifty-six percent, assessed on November 16, 2009, was not indicative of limitations precluding all work. (Tr. 35 (citing administrative hearing exhibit 18F at 6).) The ALJ, however, did not discuss Plaintiff's subsequent ejection fraction of forty-five percent assessed on April 8, 2010. (Tr. 450.) As the Commissioner notes, a claimant may be found presumptively disabled at step three of the sequential evaluation process if he has an ejection fraction of thirty percent or less and satisfies the other criteria of Listing 4.02, chronic heart failure. *See* 20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P., app. 1, § 4.02. However, a claimant with a higher ejection fraction, who meets the criteria of that listed impairment, may still be found disabled at steps four and five of the sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)-(c).

Moreover, to the extent that the ALJ rejected Plaintiff's subjective complaints as not supported by the objective medical evidence, the absence of fully corroborative medical evidence cannot form the *sole* basis for rejecting the credibility of a claimant's subjective complaints. *See Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986) (it is legal error for "an ALJ to discredit excess pain testimony solely on the ground that it is not fully corroborated by objective medical findings"), *superseded by statute*, 42 U.S.C. § 423(d)(5)(A), *on other grounds as recognized in Bunnell*, 912 F.2d at 1149; *see also Burch*, 400 F.3d at 681 (explaining that the "lack of medical evidence" can be "a factor" in rejecting credibility, but cannot "form the sole basis"); *Rollins v. Massanari*, 261 F.3d 853, 856-57 (9th Cir. 2001) (same). Thus, because the ALJ did not provide any other legally sufficient reason for discrediting Plaintiff, the ALJ erred in discounting Plaintiff's subjective complaints. This error was not harmless because the vocational expert testified that an individual with the limitations to which Plaintiff testified, in particular the need to nap several times a day, would be unable to sustain regular work. (Tr. 86.) Accordingly, the Court reverses the Commissioner's disability determination.

**VII.   Remand for Benefits or for Further Proceedings**

Because the Court has decided to vacate the Commissioner's decision, it has the discretion to remand the case for further development of the record or for an award benefits. *See Reddick*, 157 F.3d at 728. In *Smolen*, the Ninth Circuit held that evidence should be credited as true and an action remanded for an immediate award of benefits when the following three factors are present: (1) the ALJ failed to provide legally sufficient reasons for rejecting evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled if such evidence credited.[6] *Smolen*, 80 F.3d at 1292; *see Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989) ("In a recent case where the ALJ failed to provide clear and convincing reasons for discounting the opinion of claimant's treating physician, we accepted the physician's uncontradicted testimony as true and awarded benefits.") (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)); *Varney v. Sec. of Health & Human Servs.* (*Varney II*), 859 F.2d 1396, 1400 (9th Cir. 1988) (stating that "[i]n cases where there are no outstanding issues that must be resolved before a proper determination can be made, and where it is clear from the record that the ALJ would be required to award benefits if the claimant's excess pain testimony were credited, we will not remand solely to allow the ALJ to make specific findings regarding that testimony."). The Ninth Circuit has frequently reaffirmed that improperly rejected evidence should be credited as true. *See McCartey v. Massanari*, 298 F.3d 1072, 1076–77 (9th Cir. 2002); *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000); *Reddick*, 157 F.3d at 729; *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1993).

---

[6] The Commissioner argues that the credit-as-true rule is inconsistent with the Act and with the dissenting opinion in *Vasquez* 572 F.3d at 586 (O'Scannlain, J., dissenting) (stating that the Commissioner's argument that the "credit-as-true" rule is invalid as contrary to the statute and Supreme Court precedent appeared "strong."); (Doc. 21 at 24 n.14.) However, the dissent in *Vasquez* also noted that "because the crediting-as-true rule is part of [the Ninth] [C]ircuit's law, only an en banc court can change it." *Vasquez*, 572 F.3d at 602 (O'Scannlain, J., dissenting). This Court cannot ignore the credit-as-true rule based on the Commissioner's claims that it conflicts with the Social Security Act and usurps the ALJ's role as finder of fact.

Here, the Court has found that the ALJ failed to provide legally sufficient reasons for rejecting Plaintiff's subjective complaints. There are no outstanding issues to be resolved before a disability determination may be made because the vocational expert's testimony in response to questions related to Plaintiff's subjective complaints established that the ALJ would be required to find Plaintiff incapable of any sustained work, and thus disabled, if Plaintiff's testimony were credited as true. (*See* Tr. 86.) Thus, "a remand for further proceedings would serve no useful purpose." *Reddick*, 157 F.3d at 730. On the record before the Court, Plaintiff's subjective complaints of disabling pain should be credited as true and the case remanded for an award of benefits.[7] *See Smolen*, 80 F.3d at 1284.

Accordingly,

**IT IS ORDERED** that the Commissioner's decision denying benefits is **reversed** and that this matter is remanded for an award of benefits.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly and terminate this case.

Dated this 10th day of March, 2014.

_____
Bridget S. Bade
United States Magistrate Judge

---

[7] In reaching this conclusion, the Court notes that an ALJ cannot find disability based solely on the claimant's testimony. Rather, there must also be medically acceptable clinical or laboratory evidence that "could reasonably be expected to produce the pain or other symptoms alleged." 42 U.S.C. § 423(d)(5)(A). Here, it is not disputed that Plaintiff has a medical impairment that could reasonably be expected to cause the alleged symptoms. (Tr. 35 ("After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms").) Rather, the issue is the "intensity and persistence" of those symptoms, which may be established by "statements of the individual or his physician." 42 U.S.C. § 423(d)(5)(A).